**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ANTAEUS SIMMONS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 5:19-cv-1407 |
| v. | § | |
| | § | |
| CIG LOGISTICS SERVICES, LLC; | § | JURY DEMANDED |
| CONTINENTAL INTERMODAL | § | |
| GROUP TRUCKING, LLC | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Antaeus Simmons files this, his Original Complaint and prayer for relief against Defendants CIG Logistics Services, LLC and Continental Intermodal Group – Trucking, LLC ("CIG") and in support states as follows:

**I. PARTIES**

1. Plaintiff Antaeus Simmons is a resident of Dixon, Illinois. He was formerly employed by Defendants as a driver in Gonzalez, Texas.

2. Defendant CIG Logistics Services, LLC is a Texas limited liability corporation that may be served via its registered agent: Jonathon Green, 420 Throckmorton, Ste. 550, Fort Worth, TX 76102.

3. Defendant Continental Intermodal Group – Trucking, LLC is an Oklahoma limited liability corporation that may be served via its registered agent Capitol Corporate Services, Inc., 206 E. 9th St., Ste 1300, Austin, TX 78701-4411.

## II.  JURISDICTION AND VENUE

4. The Court has jurisdiction under 28 U.S.C. §1331 (federal question). Venue exists in this district and division under 28 U.S.C. §1391.

## III.  FACTUAL ALLEGATIONS

5. In the Fall of 2018, Mr. Simmons was gainfully employed as a truck driver with Rock River Cartage in Illinois.

6. Mr. Simmons saw advertisements by CIG offering $6,000 hiring bonuses to drivers willing to work at the company's Rochelle, Illinois terminal.

7. At the time, Mr. Simmons and his wife lived in Dixon, Illinois, and had a ten-year old daughter, two year-old son, and baby daughter on the way.

8. Believing that CIG was offering stable employment close to his family's home and that he would earn a $6,000 hiring bonus his first year to help provide for the needs of his growing family, Mr. Simmons decided to quit his job at Rock River Cartage and start working for CIG.

9. On November 5, 2018, Mr. Simmons formally accepted the job working for CIG as a driver at CIG's Rochelle, Illinois terminal.

10. During his employment with CIG in Rochelle, Illinois, Mr. Simmons informed CIG management that he practiced the Islamic faith.

11. Mr. Simmons also wore a beard while working at the Rochelle terminal because his sincerely held religious beliefs required him to grow, and not shave, his beard.

12. Mr. Simmons never had any problems practicing his Islamic faith or wearing an unshaven beard at the Rochelle terminal.

13. Approximately three months into Mr. Simmons' employment at CIG's Rochelle, terminal, CIG made a sudden announcement one day that it was no longer going to employ any

drivers out of the Rochelle, IL terminal.

14. CIG gave Mr. Simmons and the other drivers twenty-four hours notice that if they wanted to continue their employment with CIG, they would have to go report to work at CIG's Gonzalez, Texas terminal.

15. Mr. Simmons still had not fully earned his hiring bonus at the time CIG told the Rochelle drivers that their only option to continue their employment with CIG was to go to Gonzalez, Texas.

16. So, in early February 2019, on less than twenty-four hours notice, Mr. Simmons left his wife and three young children behind to go to Gonzalez, Texas to maintain his employment with CIG.

17. Upon arrival in Gonzalez, Texas, Mr. Simmons learned that CIG assigned drivers at the Gonzalez, Texas terminal to pick up and deliver loads to certain oil well sites.

18. The unloading work at the oil well sites required drivers to wear a respirator for approximately 5 to 10 minutes when they exit their truck to unload sand at the oil well sites.

19. CIG told Mr. Simmons that, because of the respirator requirement, he either had to shave his beard, or go home without any mileage reimbursement or pay.

20. No one at the Rochelle terminal had told Mr. Simmons that he'd be required to wear a respirator or shave his beard once he got to Texas.

21. Mr. Simmons informed CIG management that it was against his religion to shave his beard.

22. Other Rochelle drivers who were not able to pass safety tests to begin driving to the oil well sites right away were accommodated with other work assignments at the Gonzalez, Texas terminal.

23. CIG, however, did not offer to accommodate Mr. Simmons with any other work assignment.

24. Instead, CIG insisted that the only option for Mr. Simmons to keep his job and earn his first paycheck in Gonzalez, Texas was to immediately shave his beard so he could make deliveries to the oil well sites.

25. Finding himself thousands of miles from home without enough money in his checking account to either pay for his own hotel room or return home, Mr. Simmons violated his religious beliefs, committing an act of "haram" –an act forbidden by the sacred Islamic text, the Quran – and shaved his beard.

26. Committing this act of haram caused Mr. Simmons significant religious and moral distress, and he vowed never to do it again.

26. Mr. Simmons told CIG that he would not shave his beard again, because it was against his religion.

27. Mr. Simmons sent a formal e-mail requesting religious accommodations to CIG management and to the human resources department.

28. At first, CIG's Vice President of Human Resources, Joyce Stock, took the lead in responding to Mr. Simmon's request for accommodation.

29. Ms. Stock appeared to understand the seriousness of Mr. Simmon's request.

30. On February 27, 2019, Ms. Stock informed Mr. Simmons by e-mail that she was searching for alternative respirator options that could accommodate his beard.

31. Then, on February 28, 2019, Ms. Stock sent Mr. Simmons an e-mail that indicated no alternative respirator option would be made available to Mr. Simmons, but that offered Mr. Simmons two other options.

32. Ms. Stock's February 28, 2019 e-mail read as follows:

> **From:** jstock@ciglogistics.com
> **Date:** February 28, 2019 at 3:47:12 PM CST
> **To:** 'Antaeus Simmons' <mrsimmonsantaeus86@icloud.com>
> **Cc:** 'rjohnson' <rjohnson@ciglogistics.com>
> **Subject:** RE: Shaving, Muslim
>
> Mr. Simmons -
>
> We have arranged for Red Eye Safety to be at the Gonzales yard tomorrow morning around 8-8:30. Please be there at that time for your respirator fit test. As we discussed, you should shave your facial hair to whatever length you believe is necessary in observance of your religious beliefs. If you can pass the fit test with that length, the test administrator has been instructed to take a picture of your face. This will then be the amount of hair you will be allowed to maintain as long as you are in a position that requires the use of the face mask.
>
> If you are not able to pass the fit test, we will discuss if there are any other positions available for which you may qualify.
>
> Regards,
> Joyce

31. The day after Ms. Stock sent this e-mail, however, CIG reversed course.

32. Mr. Simmons' CIG supervisor did not allow Mr. Simmons to take the Red Eye Safety respirator fit test at the Gonzalez yard on March 1, 2019.

33. Instead, Mr. Simmon's supervisor drove Mr. Simmons hours away to another respirator fit test provider, Cam Safety.

34. During the drive, Mr. Simmons' CIG supervisor received a telephone call from CIG's attorney.

35. Mr. Simmons was instructed to get out of the truck so Mr. Simmons' supervisor could speak to CIG's attorney outside of Mr. Simmons' presence.

36. When Mr. Simmons and his supervisor finally made it to Cam Safety, Cam Safety told Mr. Simmons that they had already informed CIG they would not perform a respirator fit test on Mr. Simmons unless he was completely shaven.

37. CIG did not provide Mr. Simmons any other option to take a respirator fit test with his beard unshaven.

38. At this time, Mr. Simmons was living in a hotel room paid for by CIG in Gonzalez,

Texas.

38. CIG gave Mr. Simmons the ultimatum that he either had to shave his beard by Sunday March 3, 2019, or leave the hotel and lose his job.

39. Mr. Simmons did not shave his beard by March 3, 2019 and, as a result, lost his job at CIG.

40. As of March 1, 2019, CIG was still providing alternate work assignments that did not require wearing respirators to other drivers from Rochelle who had not passed the safety requirements to make deliveries to oil well-sites.

41. CIG did not offer Mr. Simmons an alternate work assignment as a reasonable accommodation for his religious beliefs.

42. As of March 1, 2019, CIG had other open and available positions at the Gonzalez, Texas terminal that would not have required Mr. Simmons to wear a respirator.

43. As of March 1, 2019, CIG had other open and available positions at other CIG terminals that would not have required Mr. Simmons to wear a respirator.

44. As of March 1, 2019, CIG had other open and available positions at the Gonzalez, Texas terminal that would not have required Mr. Simmons to shave his beard.

45. As of March 1, 2019, CIG had other open and available positions at other CIG terminals that would not have required Mr. Simmons to shave his beard.

46. CIG, however, did not offer Mr. Simmons any other position as an accommodation for his religious beliefs.

47. CIG also could have accommodated Mr. Simmons' religious beliefs by allowing Mr. Simmons to wear a different kind of respirator to accommodate his beard.

48. A PAPR respirator exists that allows men with beards to work in jobs requiring

respirators.

49,     No one at CIG ever sat down with Mr. Simmons to discuss his specific job duties and whether wearing a PAPR respirator would have allowed Mr. Simmons to both wear a beard in observance of his religious beliefs and perform his job duties.

50.     Basic descriptions of the differences between the type of respirator CIG provided to drivers at the Gonzalez terminal and the PAPR respirator are set forth below:

| Regular Close-Fitting Respirator | PAPR Respirator |
|---|---|
| | |
| **Regular Close-Fitting Respirator** | **PAPR Respirator** |
| Tight-fitting respirators can be half masks, which cover the mouth and nose, or full facepieces that cover the face from the hairline to below the chin.<br><br>With some respirator systems, beards and heavy sideburns can be a problem, because they compromise the seal of certain facepieces. | PAPR (powered air purifying respirator) system uses a blower instead of lung power to draw air through the filter.  The various components of a PAPR system are designed to work together as a single unit – combining respiratory, head, eye and face protection that can be customized for almost any work environment.  PAPR systems with headtops are designed to accommodate limited facial hair.[1] |

---

[1] https://www.3m.com/3M/en_US/company-us/all-3m-products/~/All-3M-Products/Safety/Worker-Health-

51. CIG failed to engaged in a reasonable interactive process with Mr. Simmons by failing to ever discuss or offer alternative work assignments, specific alternative open and available positions, and use of PAPR respirator to Mr. Simmons.

52. CIG accommodated other employees who could not, for other, non-religious reasons unload their trucks at the well sites.

53. CIG refused to accommodate Mr. Simmons in the same way it accommodated other employees because Mr. Simmons is Muslim.

54. CIG also refused to offer Mr. Simmons any other open or available positions because Mr. Simmons is Muslim.

### IV.   COUNT ONE:
### Religious Discrimination in Violation of Title VII (42 USC § 2000e)

55. CIG Logistics Services, LLC and Continental Intermodal Group – Trucking, LLC employ at least fifteen employees, and are both employers as defined by Title VII.

56. Continental Intermodal Group – Trucking, LLC was Mr. Simmons' W-2 employer.

57. CIG Logistics Services, LLC was also Mr. Simmons' employer.

58. CIG Logistics Services, LLC and Continental Intermodal Group – Trucking, LLC share the same CEO, same General Counsel, the same employee benefit plans, and the same employee handbook.

59. CIG Logistics Services, LLC and Continental Intermodal Group – Trucking, LLC (collectively "CIG") are either an integrated enterprise under Title VII or joint employers.

---

Safety/Personal-Protective-Equipment/Powered-Supplied-Air-Respirators/?N=5002385+8709322+8711017+8711405+8720539+8720547+3294857497&rt=r3

60. CIG, by and through and its owners, employees and agents, took tangible employment actions against Mr. Simmons (terminated his employment and failed to offer him other open and available paying work assignments and positions) because of his religion.

61. Upon information and belief, after his termination, Mr. Simmons' job duties were taken over by individuals who were not Muslim.

62. Mr. Simmons was also treated less favorably than similarly situated non-Muslim employees.

63. CIG falsely claimed that Mr. Simmons resigned his position.

64. Mr. Simmons did not resign.

65. CIG falsely claimed that it was going to explore options for Mr. Simmons to both observe his religious beliefs and remain employed with CIG.

66. CIG did not offer Mr. Simmons any reasonable accommodations that would have allowed Mr. Simmons to both observe his religious beliefs and remain employed with CIG.

67. CIG will falsely claim in this litigation that it could not have accommodated Mr. Simmons with an alternative work assignment, with a PAPR respirator, or in a different open and available position either in the Gonzalez, Texas terminal or another CIG terminal.

68. CIG's purported reasons for its failure to accommodate Mr. Simmons and the separation of Mr. Simmons' employment are false and unworthy of credence, as set forth above.

69. Mr. Simmons' Islamic religion was a motivating factor in CIG's adverse treatment of Mr. Simmons.

70. Defendant's actions were taken with malice and with reckless indifference to Mr. Simmons' rights to equal employment opportunities.

71. As a result of Defendant's religious discrimination against Mr. Simmons, Mr. Simmons lost back wages, $4,500 of his hiring bonus, fringe benefits, front pay, and suffered religious, moral, and emotional distress.

72. Mr. Simmons exhausted his administrative remedies under Title VII by timely filing a Charge of Discrimination with the EEOC and timely filing this lawsuit after issuance of an EEOC Right-to-Sue letter.

73. As provided for under Title VII, Mr. Simmons seeks to recover these lost back wages, the lost portion of his hiring bonus, his lost fringe benefits, front pay in lieu of reinstatement or reinstatement with full religious accommodations and anti-retaliation protections, compensatory damages, punitive damages, reasonable attorneys' fees, costs of court, and pre and post judgment interest.

## IV.   COUNT ONE:
## Failure to Accommodate Religious Beliefs in Violation of Title VII (42 USC § 2000e)

74. Mr. Simmons incorporates all preceding paragraphs of this Complaint.

75. CIG could have reasonably accommodated Mr. Simmons' sincerely held religious belief in wearing an unshaven beard.

76. CIG could have allowed Mr. Simmons to undergo the respirator fit test with his unshaven beard using CIG's standard issue respirator with Red Eye Safety as originally planned.

76. If Mr. Simmons had not passed that test, CIG could have allowed Mr. Simmons to wear a PAPR respirator for the small amount of time Mr. Simmons spent unloading his truck at oil well sites each shift.

77. CIG also could have given Mr. Simmons work assignments that did not require him to drive to oil well sites.

78. CIG also could have offered Mr. Simmons an open and available position as a driver at another terminal that did not service oil well sites.

79. CIG also could have offered Mr. Simmons open and available dispatcher or driver manager positions that did not require leaving the terminal.

80. CIG failed to explore all reasonably available options for accommodating Mr. Simmons.

81. CIG failed to offer Mr. Simmons any reasonable accommodation for his beard.

82. Instead, CIG stuck with giving Mr. Simmons ultimatums to either shave his beard or lose his job.

83. CIG's failure to provide Mr. Simmons reasonable accommodations for his sincerely held religious beliefs caused Mr. Simmons to lose his job at CIG.

84. CIG's actions were taken with malice and with reckless indifference to Mr. Simmons' rights to equal employment opportunities.

85. As a result of CIG's religious discrimination against Mr. Simmons, Mr. Simmons lost back wages, $4,500 of his hiring bonus, fringe benefits, front pay, and suffered religious, moral, and emotional distress.

86. Mr. Simmons exhausted his administrative remedies under Title VII by timely filing a Charge of Discrimination with the EEOC and timely filing this lawsuit after issuance of an EEOC Right-to-Sue letter.

87. As provided for under Title VII, Mr. Simmons seeks to recover these lost back wages, the lost portion of his hiring bonus, his lost fringe benefits, front pay in lieu of reinstatement or reinstatement with full religious accommodations and anti-retaliation protections, compensatory

damages, punitive damages, reasonable attorneys' fees, costs of court, and pre and post judgment interest.

## VI.   JURY DEMAND

88.   Mr. Simmons demands a trial by jury.

## VII.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Mr. Simmons prays that Defendants be cited to appear and answer herein, and that on final trial, Mr. Simmons have and recover the following relief against Defendants, jointly and severally,:

- a. Judgment against Defendants for past lost wages and benefits, the sum to be determined by a jury at time of trial;

- b. Judgment against Defendants for future lost wages and benefits, the sum to be determined by the Court as an equitable remedy post-trial;

- c. Judgment against Defendants for compensatory damages in the maximum amount allowed by law;

- d. Judgment against Defendants for punitive damages as permitted by Title VII;

- e. Pre-judgment and post-judgment interest at the maximum amount allowed by law;

- f. Costs of suit, including reasonable attorney's fees and expert witness fees; and

- g. The award of such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Date: December 4, 2019

Respectfully submitted,

TREMAIN ARTAZA PLC

/s/ *Christine A. Hopkins*
Christine A. Hopkins
Texas State Bar No. 24095768
christine@tremainartaza.com

Ashley E. Tremain
State Bar No. 24066209
ashley@tremainartaza.com
13140 Coit Rd., #104
Dallas, TX 75240
Direct: (469) 573-0297
Fax: (214) 254-4941

**COUNSEL FOR PLAINTIFF**
